[No. S110206. Feb. 5, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANTHONY JACKSON, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo, Assistant State Public Defender, Mark Hammond and Craig Buckser, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Donald E. de Nicola, Deputy State Solicitor General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, and Sharlene A. Honnaka, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—In 1984, defendant Michael Anthony Jackson was convicted and sentenced to death for murdering a police officer who was engaged in the performance of his duties. This court affirmed the judgment in *People v. Jackson* (1989) 49 Cal.3d 1170 [264 Cal.Rptr. 852, 783 P.2d 211], but the Ninth Circuit Court of Appeals set aside the penalty verdict and death sentence, finding defendant had received ineffective assistance of counsel. (*Jackson v. Calderon* (9th Cir. 2000) 211 F.3d 1148.) Following a penalty phase retrial, a judgment of death again was imposed on September 20, 2002. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) As explained below, we affirm the judgment.

## I. FACTS

### A. *Prosecution Evidence*

Shortly after noon on August 31, 1983, West Covina Police Officer Ken Wrede radioed that he had been told by a citizen of an intoxicated person in the area and would "be checking." A few minutes later, Edward Butler,[1] who

---

[1] Butler had died prior to the penalty phase retrial. His testimony at the prior trial was read to the jury.

was working in the area, noticed defendant walking toward the corner of Glenview Road and Francisquito Avenue. Defendant was walking "kinda crooked." Officer Wrede arrived, made a U-turn, and pulled to the curb at an angle. He radioed that defendant was "possibly dusted," meaning under the influence of phencyclidine (PCP), and requested backup. Officer Wrede got out of the vehicle, asked defendant where he was going, and told defendant to sit down on the curb.[2] Defendant began to walk away and the officer used his walkie-talkie to again request backup.[3] The officer again told defendant to sit down on the curb, but defendant continued walking. The officer approached defendant "and kind of tapped him in the back of the knees with the billy club." Defendant "turned around and he started fighting."[4]

Defendant and the officer fell to the ground and began "tussling" and fighting. Defendant was punching and kicking the officer. Officer Wrede tried to defend himself and struck defendant in the midsection with his baton several times, to no effect. Officer Wrede sprayed Mace in defendant's face several times, with no apparent effect. Defendant pulled a wooden tree stake out of the ground, uprooting the tree it was supporting, and swung the stake at the officer, who blocked it with his baton, causing the stake to fly into the street. During the altercation, defendant ripped the officer's badge from his uniform and broke his sunglasses.

Officer Wrede ran to the driver's side door of the police vehicle and defendant ran to the opposite side of the vehicle, opened the passenger side door and grabbed a shotgun that was secured in a rack. Officer Wrede broadcast, "he's got my shotgun rack," and then pushed defendant and they struggled over the shotgun until defendant ripped the shotgun and the rack from the vehicle.[5] Officer Wrede broadcast, "he pulled it out," and then pointed his handgun at defendant over the roof of the vehicle. The shotgun was kept in the rack at "patrol ready," meaning there were four rounds of ammunition in the magazine and the safety was on. To fire the shotgun, the safety must be off and a round must be moved from the magazine to the firing chamber by sliding the pump action. Defendant attempted to load a round into the shotgun by sliding the pump. He pointed the weapon at the victim and appeared to pull the trigger, but the shotgun did not fire. Defendant again tried to load the weapon, which was still in the rack. This

---

[2] About this time, Robert Dunham (who was 19 years old at the time) drove by on his way to a gas station and saw defendant and the victim engaged in a "heated discussion."

[3] Over the next several minutes, Officer Wrede radioed twice more asking for assistance.

[4] When Dunham returned after buying gasoline, defendant and the victim were fighting on the front lawn of a residence.

[5] In a later experiment, a police officer was able to quickly rip a similar shotgun and rack from another patrol car. The rack was affixed to the metal floorboard of the vehicle by two machine screws. A third screw went into the foam dashboard.

time, defendant was able to move the slide and Dunham heard the sound of a load entering the firing chamber of the shotgun. Officer Wrede crouched down behind the vehicle, still pointing his gun at defendant. Defendant then laid the shotgun on the roof of the vehicle and placed his hands on the roof of the vehicle, appearing to give up. Officer Wrede pointed his gun up, above defendant, and started to walk around the vehicle when defendant picked up the shotgun and shot the officer in the head.

Los Angeles Deputy Sheriff Stephen Vine was told by a passing motorist that a fight was occurring and he arrived at the scene just after Officer Wrede was shot. Deputy Vine pulled his vehicle next to Officer Wrede's vehicle and saw Officer Wrede's body on the ground. As Deputy Vine left his vehicle, defendant stood up from behind Officer Wrede's vehicle and pointed the shotgun at Deputy Vine. Deputy Vine ducked back into his vehicle, backed away from defendant a couple of hundred feet, and jumped back out of the vehicle with his gun drawn. Defendant was walking toward the deputy, pointing the shotgun at him. Defendant appeared to be trying to both pull the trigger and move the slide to load a round into the shotgun.

West Covina Police Officer Arthur Marinello and his police dog came up behind defendant. Deputy Vine yelled for Officer Marinello to shoot defendant or release his dog. Defendant responded by repeating "I'll shoot you" and "I will kill all you fucking pigs," as he continued to point the shotgun at the deputy while both pulling at the trigger and trying to load a round into the chamber. Officer Marinello released his dog. Defendant struck the dog with the butt of the shotgun, stunning the animal, but the dog recovered and bit defendant, causing him to fall to the ground and drop the shotgun. West Covina Police Officer Christopher Mohler, who had arrived on the scene on his motorcycle just after Deputy Vine, ran into the street, kicked the shotgun to the side and grabbed defendant's arm as Officer Marinello grabbed defendant's other arm. Defendant struggled and tried to grab Officer Marinello's gun and Officer Mohler's gun. Deputy Vine approached and struck defendant in the stomach with his baton three or four times, subduing defendant enough to permit the other officers to handcuff defendant.

Deputy Sheriff Sabino Muniz arrived at the West Covina Police Station shortly after defendant was arrested and accompanied defendant as paramedics transported him to a hospital for treatment. The parties stipulated that a blood sample taken from defendant shortly after the crime revealed the presence of PCP. At the hospital, defendant answered the deputy's preliminary questions, stating his name, age, birthday, address and other information without difficulty or apparent confusion. A couple of hours later, after

defendant had been treated, defendant asked Deputy Muniz: "Why am I under arrest? Am I being charged for killing a cop?" To Deputy Muniz's knowledge, no one had mentioned in defendant's presence that a police officer had been killed.

Los Angeles County Sheriff's Detective Sergeant Michael Lee, a homicide investigator, later questioned defendant in his hospital room in the jail ward. He advised defendant of his rights, which defendant waived. Defendant was responsive and appeared to understand. Defendant asked Sergeant Lee what he was being arrested for, and Sergeant Lee answered, "murder." Defendant asked, "I killed a policeman?" The next day, Sergeant Lee and his partner returned and asked defendant if he remembered them. Defendant replied, "Yeah, you're the cops that said I shot that officer with a shotgun." To Sergeant Lee's knowledge, no one had told defendant that Officer Wrede had been killed with a shotgun. Sergeant Lee asked defendant how he knew Officer Wrede had been killed with a shotgun. Defendant replied he had read it in the newspaper, but newspapers were not available in the jail ward and defendant's wrists were secured to the sides of his bed.

George T. testified that seven years earlier on June 18, 1976, when he was 17 years old and in the Army, defendant and another man entered his barracks at 11:00 p.m. and climbed into his bunk. Defendant's accomplice struck the witness in the face and defendant sodomized him, causing his rectum to bleed.

Raul Curiel testified that on April 16, 1969, when he was 18 years old, he was walking with a friend in West Covina when they were summoned by defendant, who was 15 years old, and an accomplice. Defendant's accomplice poked a knife in Curiel's stomach and demanded money. Curiel responded that he had no money, turning his pockets inside out and throwing to the ground his wallet and a Department of Motor Vehicles (DMV) application for a driver's license. Defendant then took the knife and demanded Curiel's cigarettes. Curiel handed defendant his cigarettes and defendant poked him in the stomach with the knife. Defendant then returned the pack of cigarettes and he and his accomplice ran off. Curiel encountered a police officer and reported that he had been robbed. Defendant and another man were arrested a short time later and Curiel's wallet and DMV application were recovered. Two knives were recovered from defendant.

George Dorta testified that on July 5, 1983, he was a West Covina police officer and conducted a traffic stop of a vehicle that was weaving. The vehicle stopped in a gas station with a minimarket and Officer Dorta approached the driver and asked for his driver's license. Defendant, who was a passenger in

the vehicle said "you don't have to do that" and got out of the vehicle and walked toward the officer with clenched fists. The driver also left the vehicle and began walking toward the officer, who retreated behind the pumps, drew his gun and ordered them to stop. Defendant cursed at Officer Dorta, but withdrew to the minimarket.

Officer Gregory Bennallack arrived in response to a request by Officer Dorta for backup and learned from Officer Dorta that defendant was in the minimarket and possibly under the influence of PCP. Officer Bennallack entered the market and told defendant to come outside. Defendant said "Fuck you, I don't want to talk to you" and began to walk away. Officer Bennallack put his hand on defendant's shoulder and said they needed to go outside and talk. Defendant again refused and then grabbed the officer with one hand and ripped his badge from his shirt with the other. Officer Bennallack struck defendant in the legs several times with his baton, which had no effect. Defendant again grabbed for the officer's badge, which was hanging from the officer's shirt and reached for the officer's gun. Officer Bennallack punched defendant in the face, causing him to fall on his face, kneeled on top of him, and handcuffed him. After defendant was booked, he threatened to rape Officer Bennallack's wife and kill his children.

Friends who knew and worked with the deceased described kind and heroic acts Officer Wrede had performed and recalled how highly people thought of him. Officer Wrede's sisters testified about his childhood, his devotion to his family and his profession, and the impact of his death on his family. The victim's wife described their life together and the impact his death had on her. His parents testified about their love for their son and how much they missed him.

Evidence was introduced that defendant had suffered a felony conviction for burglary in 1974.

B. *Defense Evidence*

The defense read to the jury the prior testimony of Lucinda Smith, who had died prior to the penalty phase retrial. She had seen defendant on the street shortly before noon on August 31, 1983. He had socks on, but no shoes, and appeared disoriented. She continued down the street and encountered Officer Wrede and told him about defendant. Officer Wrede said he would take care of it.

James Butler testified he had been defendant's friend since 1983 and they would smoke PCP together several times a week. About 10:00 a.m. on

August 31, 1989, defendant came to Butler's house with two young women and Butler gave defendant a PCP-laced cigarette. At some point, defendant kicked off his sandals and ran off.

Defendant's mother, Lillian Williams, testified that defendant was one of her six children, fathered by three different men, two of whom were deceased at the time of trial. Defendant's father, Tamridge Jackson, was a "bookie" who never lived with or supported defendant. Williams supported her family on "county aid." They lived in "shacks." Defendant was born in March 1954. The next year, Williams met and later moved in with Arthur Morrissette, until he left her for another woman five years later.

Williams admitted that she "whooped" all of her children, meaning that when angered she would strike the children with whatever object was handy. On one occasion, she choked defendant. Two of defendant's sisters and one of his brothers confirmed this.

In 1960, Lillian Williams met Mr. Williams. The next year, he and five of his six children moved in with her, so they had 11 children living in a two-bedroom house. Defendant had played sports and wanted to be a professional athlete, but around the age of 14 or 15 he began using drugs; first sniffing glue and later using PCP.

Pamela Jackson, defendant's sister, described how, as children, she and defendant would go looking for their father in "bookie joints." Although he was happy to see them, he would make them leave and never spent time with them. At home, their mother would administer whippings using a belt or extension cord, but only if they misbehaved.

Defendant's 28-year-old daughter, Shameka Dahlberg, testified that defendant has been in custody since she was eight years old but she has visited him and he calls her on the telephone every few months. She thinks of him more as a friend than as a parent.

Defendant's wife, Sabrina Jackson, testified. Defendant married Sabrina when he was in his "early 20's." She had a child when they met and she and defendant had two more children. On cross-examination, Sabrina testified that defendant was capable of taking care of himself and his family when he was not taking drugs. Defendant "wasn't the greatest writer the greatest reader," but he could read and write.

Dr. Dale Watson, a psychologist specializing in neuropsychology, tested defendant and testified that defendant has "borderline intellectual abilities.

His intelligence quotient (IQ) is in what is called the borderline range. It is just about retarded." Defendant had a "moderate degree of impairment of the brain functions." Defendant's "full scale IQ, which is a combination of both verbal and non-verbal abilities, was 79. And his verbal IQ, which is simply his ability to deal with verbal information, was also 79. His non-verbal or performance IQ was 83. All of these scores fall within what is called the borderline range." An average IQ is 100. Defendant's IQ was tested on numerous occasions between 1967 and 1980 and varied between a low of 72 and a high of 90. Defendant displayed several types of brain impairment. Outside the presence of the jury, Dr. Watson told the court that the term "mentally retarded" meant "a score of approximately 70," but that could mean an IQ of up to 75 because there was up to a five-point margin of error in testing. Defendant never had received an IQ score below 70.

Dr. Jay Jackman, a forensic psychiatrist, testified that the beatings inflicted by defendant's mother "severely impaired his development." Defendant "has borderline intelligence and he has brain impairment." "PCP is classed as a dissociative anesthetic. And what that means is that it will reduce people's level of sensation to such a degree that they can have surgical anesthesia and be alert and awake and not feel pain." The amount of PCP measured in defendant's blood following the crime "would result in a significant intoxication and impairment."

James Esten, a "correctional consultant," examined defendant's prison records and testified that he would not pose a threat to inmates or staff if he was sentenced to life in prison without parole.

### C. *Prosecution's Rebuttal Evidence*

On rebuttal, Daniel Smith testified that on July 27, 1969, he was returning home from the store with loaves of bread and some food stamps while running an errand for his mother. As he rode through an alley on his bicycle, several people, led by defendant, jumped out of an automobile and ordered him to stop. When he did not stop, one of them threw a rock, which hit him on the arm, causing him to fall off his bicycle. Defendant and another person grabbed Smith and threw him up against a wall. One person threatened Smith with a rock while defendant emptied his pockets and ripped a St. Christopher medal from his neck. They took everything he had, including the bread and the food stamps. Smith later told his family, who notified the police, and defendant was arrested.

Dr. Terrence McGee, a physician specializing in addiction medicine, testified that the high level of PCP in defendant's blood at the time of the

crime indicated defendant had developed a tolerance for the drug. Dr. McGee opined that although defendant was under the influence of PCP, "it was a very minor pattern."

## II. DISCUSSION

### A. Denial of Continuance to Prepare Atkins Defense

On March 13, 2001, pursuant to the decision of the Ninth Circuit Court of Appeals, the federal district court denied defendant's petition for writ of habeas corpus "as to the guilt phase" and granted his petition "as to the penalty phase of that proceeding." On April 24, 2001, the case was called in the Los Angeles Superior Court. Defendant was not present but was represented by the public defender. The public defender declared a conflict of interest and was relieved as counsel and the case was continued to April 30, 2001.

On April 30, 2001, defendant was present in court and counsel was appointed to represent him. Defendant waived the statutory time for trial and the case was continued numerous times. On February 27, 2002, the trial court granted defendant's request to continue the trial to May 29, 2002, but noted that no further continuances would be granted and trial would commence on that date.

On May 6, 2002, defense counsel filed a written motion for continuance, stating that obligations in other cases had prevented him from adequately preparing for the penalty phase retrial. On May 10, 2002, the trial court granted the motion and continued the trial to July 1, 2002.

On June 20, 2002, the United States Supreme Court held in *Atkins v. Virginia* (2002) 536 U.S. 304, 321 [153 L.Ed.2d 335, 122 S.Ct. 2242], that executing a mentally retarded defendant is prohibited by the Eighth Amendment to the United States Constitution as "cruel and unusual" punishment. The high court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."[6] (536 U.S. at p. 318.) The

---

[6] The court quoted definitions of mental retardation by the American Association on Mental Retardation and the American Psychiatric Association, both of which required significantly subaverage intellectual functioning with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work that manifests before age 18. The court described " '[m]ild' mental retardation" as "an IQ level of 50–55 to approximately 70." (*Atkins v. Virginia, supra*, 536 U.S. at p. 308, fn. 3.)

high court, however, left to the states the task of establishing procedures to determine which offenders were retarded. (*Id.* at p. 317.)

On June 24, 2002, defendant filed a written motion to continue the trial "due to the decision of the Supreme Court of the United States in Atkins v. Virginia." The motion stated that the high court had ruled "that mentally retarded people could not receive the death penalty," but defendant's motion acknowledged that "[t]he issue that is not clear is what constitutes being mentally retarded." Defendant stated: "The Supreme Court has decided that the individual States should define what Mental Retardation means. There is no definition of Mental Retardation for this purpose in California Law. The Supreme Court does not define Mental Retardation in this decision."

The motion for continuance stated that a week earlier (three days prior to *Atkins*) defendant had been tested to determine if he "was a 'brain damaged' person" and he was determined to have an IQ of 79, which defense counsel described as "borderline for retardation." Defense counsel requested a 60-day continuance, stating he could not be ready for trial until he investigated "the adaptive functioning factors that are mentioned in the Atkins v. Virginia opinion."

At a hearing on the motion conducted that day, the trial court indicated it was not inclined to continue the case, asking defense counsel what he hoped to learn. Defense counsel responded that he hoped the Legislature would define mental retardation. The trial court stated: "I'm not going to continue the case based on what the Legislature may or may not do. The period of time for a bill to get through our legislature at a minimum you are talking months, counsel. It is speculative and I will not do it. I cannot see any reason at all to continue the matter. None at all. If you have evidence that your client is mentally retarded, that is evidence that you would put on in any event. The record will be clear that it is an issue and both sides should be prepared to put on whatever they have in the issue. These cases are not going to be resolved at the trial level. Not for many years will there be given a standard to give to the jurors. I'm not going to try to explain to the jury that if the person is 'mentally retarded' they should not impose the death sentence. I don't feel equipped to do that. There would be no guidance here for this court to do it and it would be an exercise in futility." The penalty phase retrial commenced on July 1, 2002.

■ Defendant contends the trial court deprived him of his rights to the assistance of counsel and due process of law under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by denying his motion to continue the trial. "The determination of whether a continuance

should be granted rests within the sound discretion of the trial court, although that discretion may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

The trial court did not abuse its discretion in denying defendant a continuance to investigate "the adaptive functioning factors that are mentioned in the Atkins v. Virginia opinion" and to wait for the Legislature to define mental retardation. Defendant asserts: "The trial court was required to follow the law set forth in *Atkins*." The trial court did so. *Atkins* simply held that mentally retarded defendants could not be executed and left it to the states to define mental retardation and establish procedures to determine which defendants were mentally retarded. The trial court was correct that it would be months, at least, before the Legislature would define mental retardation and establish the necessary procedures for determining which defendants were mentally retarded. In fact, it was not until the following year that the Legislature enacted Penal Code section 1376,[7] which defines "mentally retarded" and establishes procedures for determining whether a defendant is mentally retarded.[8] The trial court, therefore, did not violate the holding in *Atkins* by proceeding to trial in the absence of guidance from the Legislature on how to implement the holding in that case and did not abuse its discretion in denying defendant's motion to continue the trial.

Even had defendant established that the trial court abused its discretion in denying his motion to continue the trial in light of the high court's decision in *Atkins*, the record before this court does not establish that defendant was prejudiced. (*People v. Zapien* (1993) 4 Cal.4th 929, 972 [17 Cal.Rptr.2d 122, 846 P.2d 704] [" 'In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction.' "].) Nothing in the record before us suggests that defendant would have been able to show that he was retarded had the trial court granted his request for a continuance. Defendant's expert did not testify he was retarded, but rather that he was in "the borderline range" and "just about retarded." Defendant does not argue in this court that he is retarded. He argues only that "the question of whether [defendant] is mentally retarded has never been adequately investigated as a discrete and decisive issue."

---

[7] Further undesignated statutory references are to the Penal Code.

[8] Section 1376 defines "mentally retarded" to mean "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (Stats. 2003, ch. 700, § 1.) If the prosecution seeks the death penalty, the defendant may elect to have the court determine whether the defendant is mentally retarded prior to trial, or have the jury determine the issue following a conviction of murder with special circumstances. (§ 1376, subd. (b)(1).)

■ Defendant contends he must be granted a new penalty phase trial at which jurors have the opportunity to decide whether he is mentally retarded. Defendant asserts that he has a right to have a jury determine whether he is mentally retarded under *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], which held that the Sixth Amendment to the United States Constitution requires that a jury must determine all facts that make a defendant eligible for the death penalty. Defendant asserts that *"Atkins* expressly transformed mental retardation from solely a mitigating factor into a 'narrowing' circumstance that determines a defendant's eligibility for the death penalty."

■ As noted above, the Legislature in 2003 enacted section 1376, which grants a defendant "[i]n any case in which the prosecution seeks the death penalty . . . a jury hearing to determine if the defendant is mentally retarded" if the defendant first submits "a declaration by a qualified expert stating his or her opinion that the defendant is mentally retarded." (*Id.*, subd. (b)(1).) Two years later, this court held that section 1376 applied only to preconviction proceedings and adopted a similar procedure for defendants challenging a judgment of death. (*In re Hawthorne* (2005) 35 Cal.4th 40, 47 [24 Cal.Rptr.3d 189, 105 P.3d 552].) We held that such a postconviction claim of mental retardation "should be raised by petition for writ of habeas corpus . . . . To state a prima facie claim for relief, the petition must contain 'a declaration by a qualified expert stating his or her opinion that the [petitioner] is mentally retarded . . . .' [Citation.]" (*Ibid.*) We did not, however, grant a similar right to a jury trial, deeming it "inappropriate to extend the jury trial option to postconviction claims." (*Id.* at p. 49.) We held there was "no constitutional mandate" to have a jury determine whether a defendant facing a judgment of death is mentally retarded, noting that the high court in *Atkins* "expressly left to the states the responsibility of ' "developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." [Citation.]' [Citation.]" (*Id.* at p. 50.)

In *Schriro v. Smith* (2005) 546 U.S. 6 [163 L.Ed.2d 6, 126 S.Ct. 7], the high court reaffirmed that its decision in *Atkins* does not give a capital defendant a right to have a jury determine whether he or she is mentally retarded. The defendant in *Schriro* was sentenced to death in Arizona and filed a petition for writ of habeas corpus in federal court. After *Atkins* was decided, the defendant asserted that he was mentally retarded. The Ninth Circuit Court of Appeals suspended the proceedings and directed the defendant to " 'institute proceedings in the proper trial court of Arizona' " and further ordered that whether Smith is mentally retarded must " 'be determined . . . by a jury trial unless the right to a jury is waived by the parties.' " (*Id.* at p. 7.) The high court reversed, holding that "[t]he Ninth Circuit erred in commanding the Arizona courts to conduct a jury trial to resolve [defend-

ant]'s mental retardation claim. *Atkins* stated in clear terms that ' "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." ' [Citation.] . . . Arizona had not even had a chance to apply its chosen procedures when the Ninth Circuit pre-emptively imposed its jury trial condition." (*Id.* at pp. 7–8.) Accordingly, even if defendant had met the threshold requirement imposed in *Hawthorne* of submitting a declaration from a qualified expert stating that he is mentally retarded, he would not have a constitutional right to have a jury determine whether he is mentally retarded.

Defendant claims he "is entitled to the statutory procedural protections of section 1376." As noted above, we held in *Hawthorne* that, "[b]y its terms, section 1376 applies only to preconviction proceedings." (*In re Hawthorne, supra,* 35 Cal.4th at p. 44.) Defendant argues that our decision in *Hawthorne* does not apply because his trial was conducted after *Atkins* was decided. Defendant asserts he "had a right to have *Atkins* applied to his death penalty trial." Defendant is incorrect. The decision in *Atkins* did not require that defendant's trial be conducted in any particular fashion. The decision in *Atkins* simply held that defendant could not be executed if he is mentally retarded. Under our decision in *Hawthorne*, defendant still may raise that claim in a petition for writ of habeas corpus.

Citing *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 105 S.Ct. 3249], defendant contends that failing to grant him the procedural protections of section 1376 would deny him equal protection of the law, because he is similarly situated "to a preconviction defendant." Defendant is not now similarly situated "to a preconviction defendant" because he is facing a judgment of death. Nor was he similarly situated "to a preconviction defendant" for purposes of section 1376 just prior to the second penalty phase trial, because section 1376 was not enacted until after the judgment of death was entered.

■ Defendant claims he must be granted a new penalty phase trial, "as opposed to remand for an after-the-fact determination of mental retardation only" because "[s]eparate from the issue of his *eligibility* for the death penalty, a defendant . . . must be allowed the opportunity to present evidence of his mental retardation as mitigation . . . ." Defendant reasons that "*Atkins'* holding that the Eighth Amendment restricts the states from imposing death sentences on the mentally retarded necessarily changed the mitigating significance of mental retardation evidence in a capital penalty trial" because a state may not permit an individual juror "to vote for the death penalty if that juror believes . . . the defendant is mentally retarded." Defendant argues that "after *Atkins*, the extenuating force of a defendant's mitigating evidence of mental

retardation must be deemed absolute." The decision in *Atkins* does not say that. The decision in *Atkins* does not discuss or alter the mitigating effect of evidence of mental retardation or discuss or alter the circumstances under which an individual juror may vote for a sentence of death. As noted above, the decision in *Atkins* simply held that a defendant could not be executed if he or she is mentally retarded, and left to the states the tasks of defining mental retardation and establishing procedures to determine which defendants are mentally retarded.

Defendant contends he must be granted a new penalty phase trial so that the prosecution can decide whether to seek the death penalty in light of "the factors and principles identified in the *Atkins* decision." There is no need to do so. The People point out that after the parties discussed the then recent decision in *Atkins*, the prosecutor stated: "I don't think he is mentally retarded. I'm ready to go forward."

B. Marsden *Error*

Defendant asserts that the trial court did not conduct an adequate inquiry into the reasons for his repeated requests to discharge his appointed counsel, violating his Sixth and Fourteenth Amendment rights to counsel and his Eighth Amendment "heightened need for reliability in a capital case."

We held in *People v. Marsden* (1970) 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44], that "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court . . . ." The defendant in *Marsden* told the trial court he did not feel he was being adequately represented and moved for " 'proper counsel.' " (*Id.* at p. 121.) The court denied the motion, noting that appointed counsel had been " 'alert and has raised questions during the course of this hearing.' " (*Id.* at p. 122.) The defendant asked whether he could " 'bring up some specific instances,' " but the court refused, saying " 'I don't want you to say anything that might prejudice you before me as to the case . . . .' " (*Ibid.*)

This court reversed the defendant's subsequent judgment of conviction, ruling that the trial court could not "thoughtfully exercise its discretion in this matter without listening to [the defendant's] reasons for requesting a change of attorneys" because "[t]he defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom." (*People v. Marsden, supra,* 2 Cal.3d 118, 123.) We held, therefore, that "a judge who denies a motion for substitution of attorneys

solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." (*Id.* at p. 124.)

"A defendant 'may be entitled to an order substituting appointed counsel if he shows that, in its absence, his Sixth Amendment right to the assistance of counsel would be denied or substantially impaired.' [Citation.] The law governing a *Marsden* motion 'is well settled. "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]." [Citations.]' [Citation.]" (*People v. Memro* (1995) 11 Cal.4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; see *People v. Panah* (2005) 35 Cal.4th 395, 431 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

As noted above, the present case returned to the Los Angeles Superior Court from the federal court of appeals for a new penalty phase trial on April 24, 2001. The public defender declared a conflict of interest and Anthony Robusto was subsequently appointed as counsel. Following numerous continuances, Robusto agreed to a trial date, which led defendant to request cocounsel status. The court denied defendant's request for cocounsel status, but invited him to renew his request in writing.

On February 27, 2002, defendant gave the court a three-page handwritten motion to appoint him as cocounsel. Defendant stated that when he was returned to county jail on April 26, 2001, following the reversal of his death sentence by the Ninth Circuit, he was "allowed access to the telephone" to contact his attorney, family members, and potential witnesses. On October 13, 2001, however, he was transferred to another section of the jail where he was "restricted." Defendant wrote: "These restriction[s] interfere with my right to a fair and impartial trial because [I cannot] help my attorney prepare a defense or aid in my own defense. . . . I am force[d] to go co-counsel to prepare a strong defense on my behalf." The court read the motion, asked defendant if he had anything to add, and again denied defendant's motion for cocounsel status, later adding: "I know you are not happy with [your] current[] housing situation. I am not going to remedy that by granting [you] co-counsel [status]."

After a short discussion about jury selection, Robusto moved to continue the trial, prompting defendant to say, "If that's the case, I need another

attorney. I request another attorney," representing that he had "lined up" another attorney named Allen Gluck. The following exchange then occurred:

"The Court: Did you hire them.

"The Defendant: No. I would like for the court to hire them.

"The Court: You want me to hire them. I don't intend to hire Mr. Gluck. We already got a[n] attorney on the case.

"The Defendant: I prefer to have two.

"The Court: You would probably like three or four and be co-counsel to[o]. Your request for another attorney at this point based on this attorney's request for continuance is denied."

Defendant argues that his "statement, 'I request another attorney,' . . . could not have been clearer, and the trial court[] obviously understood [defendant] was asking for a substitute attorney."[9] But defendant disregards the fact that when the court stated it would not appoint Gluck because defendant already had an attorney, defendant clarified that he was not asking to discharge Robusto as his counsel, but was asking for another attorney in addition to Robusto, explaining "I prefer to have two." The court demonstrated that it understood defendant was asking for an additional attorney by replying: "You would probably like three or four . . ." before denying defendant's request for another attorney. Unlike the situation in *Marsden*, defendant said nothing to indicate he was dissatisfied with Robusto's representation, or wished to relate specific instances of misconduct. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150].) The trial court did not err in denying defendant's request for another attorney without further inquiry.

Defendant contends he "made a second request to substitute counsel on May 10, 2002." The record does not support this description of defendant's request. On May 10, 2002, the court granted Robusto's motion to continue the trial. Defendant asked the court to "reconsider my request about counsel or co-counsel." The trial court agreed and defendant complained about "all these delays" and said that the attorney who had represented him on appeal "is very capable of handling the experts, PCP experts and get the job done

---

[9] The court later indicated its understanding that defendant was asking for an additional attorney rather than substitute counsel, in the following exchange: "The Defendant: . . . when I asked for another attorney, you denied it. [¶] The Court: You mean an additional—[¶] The Defendant: Yes."

real quick." The court denied defendant's request, stating: "Your request for co-counsel has been ruled upon and I haven't heard anything today to make me change my mind on that."

Defendant claims the court erred by failing to make "a thoughtful determination of [defendant]'s request for substitute counsel." But as before, the record is clear that defendant did not ask to substitute Robusto as counsel, but rather to appoint defendant's former appellate counsel as cocounsel in addition to Robusto. As before, defendant was given an ample opportunity to state the reasons for his request and said nothing to indicate he wished to relate specific instances of misconduct.

Two months later, defendant again asked the court to reconsider his request for cocounsel and, for the first time, appeared to ask that Robusto be replaced. On July 1, 2002, while a jury was being selected, Robusto stated: "My client has asked me, and I have told him that this request will be denied, that during the voir dire process that we would address the jury with respect to sleep walking." The court declined "to question the jury about sleep walking for the obvious reason that nothing that I have read about in this case, including the supreme court's rather detailed recitation of facts, at all touches upon the issue" but permitted counsel to do so.

One week later, on July 8, 2002, defendant filed a two-page handwritten motion entitled "Motion for Reconsideration of Co-counsel or Appoint Another Lawyer to Assist Me," which stated, in part: "I was shock[ed] by the court and my lawyer on July 1-02 when I had my lawyer to [sic] address the juror questionnaire about asking the jury do they believe in sleep walking or do they know someone that do. My lawyer abandon[ed] me on that issue." Defendant explained that sleepwalking, or "non-insane automatism, is both significant and relevant to the present case because it shows that an individual can engage in serial activities while in an unconscious state and such individual will be amnesic [sic] as to these actions. The only difference between the unconscious states of the patient and petitioner['s] unconscious state at the time of the incident is that these individuals were in a state of unconsciousness due to the internal workings of the human mind while petitioner was in a state of unconsciousness due to gross PCP intoxication." In addition to asking the court to reconsider his request for cocounsel, defendant, for the first time appeared to ask, in the alternative, for the court to replace Robusto, stating: "The reaction you the court and my lawyer displayed on July 1 02 cause[d] me to take action on my own defense." Defendant asked the court to appoint a lawyer who was "familiar with this area of PCP who can ask the right questions to the experts for the jurors understanding." He provided the names of three attorneys, adding: "Anyone of these lawyers is capable of schooling the whole courtroom including the judge through the help of experts."

After taking a recess to read the document, the court denied defendant's request. Defendant responded, "Okay."

Defendant contends "the trial court failed to conduct any type of on-the-record inquiry to assess [defendant]'s complaints." No such inquiry was required. Defendant filed a written motion that explained in some detail that he was unhappy with Robusto's representation because Robusto had declined to question the prospective jurors about sleepwalking. Defendant said nothing to indicate he wished to relate any other instances of misconduct.

On July 10, 2002, the court denied defendant's request to represent himself. Defendant's claim that the trial court erred in denying this request is discussed separately below, but defendant further argues that the trial court committed *Marsden* error because it "failed to explore [defendant]'s more fundamental complaints with counsel, as the court failed to target specific questions to [defendant], and made no inquiry whatsoever of appointed counsel." An examination of the proceedings, including those that occurred the day before defendant's motion to proceed in propria persona, reveals no error.

On July 9, 2002, following the noon recess, the recorded proceedings outside the presence of the jury began with defendant asking to address the court. The court told defendant to "say it through your counsel." Defendant replied: "He don't want to say it," and Robusto explained that defendant had "indicated something he wants me to address the court about. In my professional opinion, I'm not going to do it." Defendant then asked "to go pro per." The court told defendant to make a written motion.

The court resumed and completed selecting a jury and the prosecutor made his opening statement.

On July 10, 2002, defendant filed a handwritten "Motion to Proceed in Pro Per," which stated that defendant had "lost all confidence and respect" for defense counsel because he had refused "to speak on my behalf many times." Defendant stated he had brought to defense counsel's attention that, during jury selection, the bailiff had indicated defendant "was a threat and danger-ous" by "grabbing his gun in his holster." Defendant declared: "For my lawyer to say he [is] not going to speak on my behalf on that issue is the last straw. . . . I want to put on my defense, not his. I had no part in his defense." Robusto confirmed that defendant had raised this issue the day before, but defense counsel "was not going to waste the court's time with raising an issue that is a waste of time, had no force and effect, and has nothing to do with the trial before the court."

In response to questions from the court, defendant explained that the bailiff in the courtroom the previous day had made "a move for his gun" every time defendant moved in his seat. The judge replied that he had "a pretty good view of what goes on in the courtroom" and had seen "nothing of the type you're describing."[10] Defendant responded: "I still have a right to go pro per," adding he felt he had "a conflict" with his attorney, stating: "My defense, it's not his defense. We got two different defense[s]." Defendant complained that "the expert he got me ain't the expert that need to be presented in this court. The PCP expert. I need a neurology. Not a PCP. . . . This neurology can explain all the movements that I made that day on PCP." The court noted that defendant's request to represent himself had not been raised "in a timely fashion," recounting that the case had been returned to superior court more than a year earlier and defendant did not ask to represent himself until the final day of jury selection. The court added that "it's up to the attorney to select the witnesses." The court denied the request on the grounds that it was not timely, that permitting defendant to represent himself would disrupt the trial, and defendant had not shown an irreparable conflict with his attorney.

Defendant is incorrect that the court committed *Marsden* error by failing "to target specific questions" to defendant or inquire further of defense counsel. Defendant was given an ample opportunity to explain his dissatisfaction with defense counsel and the trial court conducted a rather extensive examination of defendant's complaint and determined that it had no basis. No further inquiry was required.

On July 11, 2002, the court inquired further about defendant's assertion the day before that defense counsel planned to call an expert on PCP rather than a neurologist, clarifying that defendant had not subpoenaed the neurology expert he wished to call and had never spoken to the witness. The court stated: "The court's ruling will stand. I made some assumptions yesterday I believe are correct and I just wanted to make sure. I assumed the defendant was not ready to put forth a witness. And you haven't even spoken to this person."

A few days later, defendant filed a two-page handwritten document entitled "Motion for Removal of Counsel." In a paragraph bearing the heading "Conflict of Interest," defendant claimed that his rights to question jurors and

---

[10] The court held a hearing the following day at which the bailiff stated he never had reached for his weapon or touched his gun in response to anything done by defendant during jury selection, but explained that, when he stood, he usually placed his right hand on top of his gun. The court stated it was "convinced that there was nothing inappropriate that went on. . . . I don't believe the deputy touched his weapon or did anything of that sort." Over defendant's personal objection, the court declined to question the jurors.

to cross-examine witnesses had been violated. Defendant stated he wished to testify, but had "no counsel to question[] me on the stand" because his "own appointed attorney [had] become a helper of the District Attorney." Defendant stated he had asked Robusto "to get [a] neuropsychologic assessment [of] motor function, which is a lower-level function [that] can be carried out by a person whose higher-level cogniti[on] is inactive." In a paragraph bearing the heading "Breach of Attorney-Client Privilege Section 954," defendant asked that Robusto be "remove[d]" because he had disclosed at a sidebar conference a confidential communication regarding defendant's "intention for my defense." In his conclusion, defendant stated: "I am the invisible man in your courtroom. I want to be heard through a[n] attorney [I] can trust. You see every day at trial the relationship me, Michael Anthony Jackson and Attorney Anthony R. Robusto have? It[']s nonexistent and the jurors know this. Robusto must be remove[d] today. Am [I] entitled to a defense? Robusto ha[s taken] that right away from me. Its <u>his defense not mine</u>. Once again [I] ask this court to remove Robusto at once. So [I] can repair the damage Robusto allow[ed] to inflict on me by the People. So the PCP expert won't be ambush[ed] by Robusto."

The trial court read the document and asked defendant whether he had anything to add. Defendant replied: "Not unless you have any comments, no." Robusto represented that he had prepared a defense, that he intended to call about a dozen witnesses, including two expert witnesses, and that defendant would testify in his own behalf. Defendant asked, "May I comment on that?" The trial court said "no" and denied defendant's motion to remove counsel, stating: "You don't have any grounds." The exchange continued and the trial court had defendant removed from the courtroom when he refused to be quiet,[11] explaining: "I'm not going to try to get into a shouting contest with the defendant in open court so since he will not be quiet and allow the court to make a ruling, he has been removed for the purpose of simply making the ruling." Defendant then returned to the courtroom and trial resumed after the trial court warned defendant that he would be removed whenever he attempted to "talk over the court."

Defendant contends the trial court committed *Marsden* error because it "made no inquiry into . . . [defendant]'s complaint that there was a breakdown in the attorney-client relationship that was apparent to those in the

---

[11] "The Defendant: Can I comment? [¶] The Court: I don't want to argue with you. [¶] The Defendant: It is not an argument. Something I want to put on the record. [¶] The Court: Put your comments in writing. [¶] The Defendant: Still, if he made a comment about why he should do something—[¶] The Court: Quiet. [¶] The Defendant: Can I speak? [¶] The Court: The answer is no. [¶] The Defendant: So this is just a frame-up courtroom. I can't sit here—[¶] The Court: Do you want to be present during the balance of the case? [¶] The Defendant: That's on you, your honor. [¶] The Court: That is on you. [¶] The Defendant: I'm an invisible male right now. I can't speak my mind."

courtroom" and failed to "inquire into [defendant]'s complaints that he did not trust his appointed counsel." This claim is belied by the record before us. The trial court read defendant's motion to remove counsel and asked defendant if he had anything to add. The court permitted defense counsel to comment and then denied defendant's motion. The trial court was not required to inquire further. The fact that defendant did not trust his attorney did not establish a conflict that required that appointed counsel be removed. " '[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40]; see *People v. Memro, supra*, 11 Cal.4th 786, 857.)

Neither did defendant's disagreement with counsel's choice of expert witnesses and his disagreement with the defense Robusto planned to present indicate a conflict that required that Robusto be removed as counsel. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' '. . . [C]ounsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 728–729 [85 Cal.Rptr.2d 203, 976 P.2d 754]; see *People v. Nakahara* (2003) 30 Cal.4th 705, 719 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

Defendant claims the trial court erred in refusing to permit him to respond to defense counsel's comments. It is apparent that the trial court considered defendant's conduct to be disruptive, causing the court to remove defendant from the courtroom in order to state its ruling. While a trial court must permit a defendant a reasonable opportunity to relate specific instances of misconduct, the court is not required to permit a defendant to disrupt courtroom proceedings. Here, defendant was given ample opportunity to express his concerns about counsel and was invited by the court to respond in writing to defense counsel's comments. No error occurred.

C. *Defendant's Request to Represent Himself*

Defendant contends the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by denying his request to represent himself. As noted above, on July 9, 2002, defendant asked "to go pro per." The court instructed him to put his request in writing,

and the next day defendant filed a written motion to represent himself that asserted he had "lost all confidence and respect" for his attorney and wished to represent himself so he could "put on my defense, not his." The court noted that defendant's request to represent himself had not been raised "in a timely fashion," recounting that the case had been returned to superior court more than a year earlier and defendant did not ask to represent himself until the final day of jury selection. When asked why he wished to represent himself, defendant explained that defense counsel was not presenting the defense defendant wanted, stating: "My defense, it's not his defense. We got two different defense[s]." The trial court denied defendant's request to represent himself because it was untimely and granting the request would disrupt the trial proceedings.

▆▆ " 'A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. [Citations.] A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 931–932 [47 Cal.Rptr.3d 420, 140 P.3d 736].)

Once trial has commenced, the trial court has discretion to deny a request for self-representation. "[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court." (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Defendant argues that his request was timely because he made it before the jury was sworn and, thus, "the court had no choice but to grant [defendant]'s request for self-representation." Defendant is incorrect. This court never has "establish[ed] a hard and fast rule that any motion made before trial—no matter how soon before—was timely." (*People v. Clark* (1992) 3 Cal.4th 41, 99 [10 Cal.Rptr.2d 554, 833 P.2d 561].) In *Clark*, we held that the trial court did not abuse its discretion in denying a request for self-representation made three weeks before trial commenced. (*Id.* at p. 101.)

Defendant cites three decisions of the Ninth Circuit Court of Appeals for the proposition that "a request for self-representation made prior to jury impanelment is per se timely 'unless it is shown to be a tactic to secure delay.' (*Avila v. Roe* (9th Cir. 2002) 298 F.3d 750, 753, quoting *Fritz v. Spalding* (9th Cir. 1982) 682 F.2d 782, 784; see also *Armant v. Marquez*

(9th Cir. 1985) 772 F.2d 552, 555.)" In *Fritz*, the Ninth Circuit held that a defendant's request to represent himself made on the day of trial is timely unless it can be established that the request is merely "a tactic to secure delay" (*Fritz v. Spalding, supra*, 682 F.2d at p. 784), even if granting the request would delay the trial and prejudice the prosecution: "Delay per se is not a sufficient ground for denying a defendant's constitutional right of self-representation. Any motion to proceed pro se that is made on the morning of trial is likely to cause delay; a defendant may nonetheless have bona fide reasons for not asserting his right until that time [citation] and he may not be deprived of that right absent an affirmative showing of purpose to secure delay." (*Ibid.*, italics omitted.)

As defendant acknowledges, this is not, and never has been, the law in California. (*People v. Rudd* (1998) 63 Cal.App.4th 620, 628 [73 Cal.Rptr.2d 807].) Under California law, "once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court." (*People v. Windham, supra*, 19 Cal.3d 121, 128.)

The trial court did not abuse its discretion in denying defendant's request to represent himself. The court correctly stated the request was "just too late, made after a full day of voir dire and at the tail end of jury instruction," further noting that granting defendant's request would "disrupt the orderly presentation of the case." The court reasonably was concerned that it "would have to in all likelihood reopen voir dire [to] query the jury as to their thoughts and feelings about a capital defendant going pro per" and noted that defendant had not "subpoenaed witnesses of [his] own." The court denied the request, because permitting defendant to represent himself at that late date "would have made a fair trial impossible for both sides." No error occurred.

### D. *Prosecutorial Argument*

Defendant contends the death judgment must be reversed because the prosecutor asked the jurors during argument to think of how they would feel if someone they loved dearly died "in a gutter" like the victim did, "choking on his own blood." Defendant later asked for a limiting jury instruction telling the jurors "not to put yourself in the place of the victim's family; or to consider how you would feel under such circumstances."[12] The trial court refused the instruction.

---

[12] The proposed instruction read: "There was some argument by counsel to the effect that you were to think about what you might feel if you lost a loved one. The arguments of counsel are not evidence. You are not to put yourself in the place of the victim's family; or to consider how you would feel under such circumstances. You are to base your decision on the facts and law as instructed."

Defendant argues that the prosecutor's argument improperly asked the jurors to consider facts—"the juror's emotional reactions to the murder of a loved one"—that were irrelevant, not in the record, and were "inflammatory and highly prejudicial." Defendant acknowledges that jurors may be urged to consider the impact of the murder on the victim's family, but asserts this must be "tethered" to the evidence in the case. According to defendant, "[v]ictim impact evidence does not open the door to urging the jurors to subjectively analyze a case from the viewpoint of how *they themselves* would react if the defendant murdered their own loved one."

■ During the guilt phase of a capital trial, it is misconduct for a prosecutor to appeal to the passions of the jurors by urging them to imagine the suffering of the victim: "We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. [Citations.]" (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756]; see *People v. Mendoza* (2007) 42 Cal.4th 686, 704 [68 Cal.Rptr.3d 274, 171 P.3d 2].)

The situation is different, however, during the penalty phase. " 'Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision. [Citations.] Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument. [Citation.] But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment.' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

■ The prosecutor in *People v. Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776], invited the jurors to put themselves in the victim's shoes "and imagine suffering the acts inflicted on her." We held this comment "was insufficiently inflammatory to justify reversal" (*id.* at p. 864), but cautioned against excessive appeals to passion: "[A]t the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations.] In this process, one of the most significant considerations is the nature of the underlying crime. [Citation.] Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing. [¶] Nevertheless, the jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. [Citation.] In each case, therefore, the trial court must strike a careful balance between the probative

and the prejudicial. [Citations.] On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed." (*Id.* at pp. 863–864; see *People v. Wrest* (1992) 3 Cal.4th 1088, 1108 [13 Cal.Rptr.2d 511, 839 P.2d 1020] ["the jury can be urged to put itself in the shoes of the victim"]; *People v. Garceau* (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664] [proper "for the prosecutor to ask the jury to imagine the crimes from the victims' perspective"].)

A jury properly may consider the impact of the crime on the victim's family. (*People v. Zamudio* (2008) 43 Cal.4th 327, 364 [75 Cal.Rptr.3d 289, 181 P.3d 105].) Such victim-impact evidence assists the jury in assessing "evidence of the specific harm caused by the defendant['s]" crime by "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825, 822 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Accordingly, just as a prosecutor may ask the jurors to put themselves in the shoes of the victim, a prosecutor may ask the jurors to put themselves in the place of the victim's family to help the jurors consider how the murder affected the victim's relatives. (*People v. Fierro* (1991) 1 Cal.4th 173, 235 [3 Cal.Rptr.2d 426, 821 P.2d 1302] [proper to ask the jurors " 'to think a little bit about your own family and your own friends' "].) The prosecutor in *People v. Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250], argued to the jury during the penalty phase of a capital trial "to 'think about how you would feel if [the victim] were your baby, your daughter, your wife, your sister.' " Noting that the comments "were brief and mild," we held the prosecutor did not commit misconduct. (*Ibid.*)

The prosecutor did not commit misconduct by inviting the jurors to put themselves in the shoes of the victim's family and imagine the impact of the crime. And a prosecutor is "entitled to present his argument in colorful terms." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1179 [63 Cal.Rptr.3d 297, 163 P.3d 4].) While we do not encourage prosecutors to use such graphic and dramatic images, the prosecutor's comments in the present case were brief (see *People v. Stankewitz* (1990) 51 Cal.3d 72, 112 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Ghent, supra,* 43 Cal.3d at p. 772) and "did not exceed the bounds of propriety" (*People v. Medina* (1995) 11 Cal.4th 694, 778 [47 Cal.Rptr.2d 165, 906 P.2d 2]).

E. *Evidence of Other Crimes*

██ Among the aggravating factors a jury may consider during the penalty phase of a capital trial is evidence of prior "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) Defendant contends the trial court erred in instructing the jury that it could consider "[t]he alleged robbery of Edward [*sic*: Tony] Ochoa on 4/19/69" in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16 and 17 of the California Constitution.

As noted above, Raul Curiel testified that in 1969 he was walking with Tony Ochoa when defendant and another man poked a knife in Curiel's stomach and demanded money. Curiel responded that he had no money, turning his pockets inside out and throwing to the ground his wallet and a DMV application for a driver's license. Defendant took the knife and demanded Curiel's cigarettes. Curiel handed defendant his cigarettes and defendant poked him in the stomach with the knife. Defendant then returned the pack of cigarettes; he and his accomplice ran off but were apprehended a short time later.

During the discussion of jury instructions, the prosecutor asserted that both Curiel and his friend (whom the prosecutor erroneously called Edward Ochoa) were victims of the robbery described by Curiel. Defendant did not object. The court agreed but noted it made only a "slight difference" because "for all practical purposes if one was a victim they both were." The prosecutor agreed this was "[j]ust a technicality." The court instructed the jury: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal activity which involved the express or implied use of force or violence or the threat of force or violence: [¶] 1. The alleged robbery of Raul Curiel on 4/19/69 [¶] 2. The alleged robbery of Edward Ochoa on 4/19/69 . . . . Before a juror may consider any criminal activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal activity . . . ."

Defendant argues that the trial court erred in instructing the jury it could consider the alleged robbery of Ochoa because "there was no evidence that any property was taken from Ochoa." Any such error was harmless. The jurors were instructed not to consider any criminal activity as an aggravating factor unless they were "satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal activity." Also, there was ample evidence that defendant robbed Curiel during the same incident; whether defendant and

his accomplice robbed both Curiel and Ochoa, or only Curiel, could not have affected its determination of the proper penalty, especially in light of the grievous circumstances of the charged murder and the presence of other more egregious prior criminal acts.

### F. Lack of Instruction to View Defendant's Admissions with Caution

As noted above, police officers testified that defendant made several statements following his arrest that indicated his knowledge of details of the crime, including that the victim was a police officer and the murder weapon was a shotgun. Defendant argues the trial court erred in failing to instruct the jury sua sponte to view defendant's out-of-court admissions with caution.

" 'When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution. [Citation.]' " (*People v. Williams* (2008) 43 Cal.4th 584, 639 [75 Cal.Rptr.3d 691, 181 P.3d 1035].) But this general rule does not apply in the penalty phase of a capital trial. We held in *People v. Livaditis* (1992) 2 Cal.4th 759, 783 [9 Cal.Rptr.2d 72, 831 P.2d 297], "that the court is required to give the cautionary instruction at the penalty phase only upon defense request," explaining that because guilt is already established at the penalty phase, "[t]he only relevance of the defendant's extrajudicial statements is as either aggravating or mitigating evidence" and "[w]hether a particular statement is aggravating or mitigating is often open to interpretation."

Defendant argues that our decision in *Livaditis* should be distinguished because the statements in the present case, unlike those at issue in *Livaditis*, were solely inculpatory. We never have so limited the rule we announced in *Livaditis*. (*People v. Carter* (2003) 30 Cal.4th 1166, 1220 [135 Cal.Rptr.2d 553, 70 P.3d 981] [" 'because capital sentencing is a moral and normative process, it is not necessary to give instructions associated with the usual factfinding process' "]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1201 [120 Cal.Rptr.2d 477, 47 P.3d 262]; see *People v. Dunkle* (2005) 36 Cal.4th 861, 898 [32 Cal.Rptr.3d 23, 116 P.3d 494] [no sua sponte duty to instruct competency phase jury].)

Because defendant did not request a jury instruction to view his admissions with caution, there was no error.

### G. Considering Absence of Mitigating Factors as an Aggravating Factor

Defendant asserts that the trial court erred in refusing his request to instruct the jury that the absence of a particular mitigating factor could not be

weighed as an aggravating circumstance. Defendant acknowledges that we repeatedly have held that a trial court is not required "to give a jury instruction that a lack of mitigating evidence does not constitute aggravation. [Citations.]" (*People v. Carey* (2007) 41 Cal.4th 109, 133 [59 Cal.Rptr.3d 172, 158 P.3d 743].) " 'A jury properly advised about the broad scope of its sentencing discretion is unlikely to conclude that the *absence* of [mitigating] factors . . . is entitled to significant aggravating weight.' [Citation.]" (*Id.* at p. 134.)

 Defendant challenges the assumption that juries understand how to evaluate the absence of particular mitigating factors by citing several journal articles that purportedly demonstrate that juries often misunderstand mitigating and aggravating circumstances. (Haney et al., *Deciding to Take a Life: Capital Juries, Sentencing Instruction, and the Jurisprudence of Death* (1994) 50 J. Soc. Issues 149, 169; Haney & Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions* (1994) 18 Law & Hum. Behav. 411, 422–424; Haney & Lynch, *Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Closing Arguments* (1997) 21 Law & Hum. Behav. 575, 582–583, 589–591; Eisenberg & Wells, *Deadly Confusion: Juror Instructions in Capital Cases* (1993) 79 Cornell L.Rev. 1.) We rejected a similar argument in *People v. Welch, supra*, 20 Cal.4th 701, 773, stating: "The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination. [Citation.]"

### H. *Automatic Application to Modify the Verdict*

Defendant argues the trial court "failed to properly exercise its responsibilities under section 190.4, subdivision (e)" in denying his automatic application to modify the verdict of death in violation of the statute and the Eighth and Fourteenth Amendments to the United States Constitution.

Section 190.4, subdivision (e), requires that in ruling on an automatic application to modify a death verdict, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

In the present case, defendant argued to the trial court that the appropriate penalty was life in prison without the possibility of parole because defendant

had performed well in prison, had been intoxicated when he committed the offense, had a low IQ and brain defects and had "a problematic childhood." The trial court denied the motion, stating: "Notwithstanding the best efforts that the defense was able to muster in this case, the reality is, in the court's opinion, that the mitigating factors are scant at best, the aggravation rather overwhelming." In addition, the court adopted the judgment prepared by the prosecutor, which stated, in part, that after independently reviewing the evidence and assessing the credibility of the witnesses, the court found "that the jury's finding that the aggravating circumstances so substantially outweigh the mitigating circumstances so as to make death the appropriate penalty to be fully supported by the evidence and the law."

Defendant argues that the trial court treated the automatic motion to modify the verdict as a "mere formality" and had "already made up its mind" because the court had asked the prosecutor nearly a month earlier to prepare a judgment of death and death warrant. Defendant acknowledges that this court long ago recognized that the circumstance that a court "had prepared a written statement of reasons in advance of the hearing" on the automatic motion to modify the verdict "does not mean that the court's views as expressed in the writing were other than tentative or that the argument was a pointless ritual," because "[t]o do so does not mean that the court is unalterably bound by the writing or that it will not amend or even discard the writing if counsel's arguments persuade the court that its tentative views were incorrect." (*People v. Hayes* (1990) 52 Cal.3d 577, 645 [276 Cal.Rptr. 874, 802 P.2d 376]; see *People v. Seaton* (2001) 26 Cal.4th 598, 695–696 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

Defendant contends the present case differs from *Hayes* because the record in this case "overwhelmingly suggests the trial court had in fact prejudged the motion to modify the sentence, thereby rendering the hearing on the automatic motion a sham" because the trial court did not announce that the previously prepared judgment was "tentative." We do not agree. Our holding in *Hayes* applies fully here. The mere fact that the court asked the prosecutor to draft a judgment in advance of the hearing does not indicate that the court had already made up its mind. To the contrary, the court described the draft judgment it asked the prosecutor to prepare as "a working copy that the court will in all likelihood modify." And the court was under no obligation to announce that the previously prepared judgment was tentative. (*People v. Dennis* (1998) 17 Cal.4th 468, 550 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Defendant argues we should not consider the language in the judgment because after denying the automatic motion, but before reading into the record the above quoted language in the judgment, the court heard statements from the victim's parents. The claim lacks merit. The trial court already had

denied the automatic motion to modify the verdict and briefly stated the reasons for that ruling before the victim's parents made their statements. There was nothing improper in thereafter reading into the record the language of the judgment that included a more detailed statement of the reasons for the court's previous ruling. (*People v. Seaton, supra,* 26 Cal.4th at pp. 694–695.)

Defendant also asserts that the judgment of death must be vacated because the trial court failed to state sufficient reasons for denying the automatic motion to modify the verdict. Defendant forfeited this claim by failing to object in the trial court. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1140–1141 [81 Cal.Rptr.3d 614, 189 P.3d 880].)

I. *Sentencing Hearing*

Defendant argues he was denied his right to due process and "his rights under the Fourteenth Amendment and California law to address the court and present evidence as to why a death judgment should not be pronounced" because the trial court denied his request to continue the sentencing hearing.

After the jury returned its verdict, the court and counsel agreed to meet on August 26, 2002, to begin correcting the record on appeal and set September 23, 2002, as the date for sentencing. The prosecutor and defense counsel met with the judge as planned on August 26 and again on September 4 to begin correcting the record on appeal. Defendant was not present on either occasion. At the conclusion of the hearing on September 4, the prosecutor indicated he might be out of town on September 23, 2002, and asked if the sentencing hearing could be rescheduled for the preceding Friday. Defense counsel stated he had no objection, and the sentencing hearing was advanced to September 20, 2002.

On September 20, 2002, the court denied the automatic application to modify the verdict and was about to impose sentence when the prosecutor interrupted and asked the court to permit the victim's parents to address the court. The victim's parents described the effect their son's murder had had on them and asked the court to impose the death penalty. Defendant then asked if he could speak and said that he had not been aware until that day that the sentencing hearing had been advanced and he had arranged for people to appear on September 23 to speak on his behalf. The court noted that the date for sentencing had been changed weeks earlier, adding: "If that is a motion for continuance, it will be denied." The court invited defendant to make a statement, but defendant said only, "I want my people." The court then imposed sentence.

Defendant contends he was denied his "statutory right to present testimony and evidence from family members at the sentencing hearing," but cites in

support only section 1204 and our decision in *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 725 [135 Cal.Rptr. 392, 557 P.2d 976], which address correcting or explaining materials in the probation report. Defendant did not challenge the contents of the probation report and thus has no basis upon which to argue that he was denied a right to present witnesses for this purpose. Even assuming, without deciding, that defendant had a right to present witnesses at the sentencing hearing, the court did not prevent him from doing so. The court only declined to continue the hearing. Defendant does not argue that the trial court abused its discretion in declining to continue the sentencing hearing. Nor does defendant argue that his attorney was ineffective because he failed to inform defendant that the date of the sentencing hearing had been advanced.

 Defendant does argue that he was denied his right to allocution, because he was unprepared for the sentencing hearing. Recently, we held in *People v. Evans* (2008) 44 Cal.4th 590 [80 Cal.Rptr.3d 174, 187 P.3d 1010], that a defendant in a noncapital case has a "right at sentencing to make a *sworn* personal statement in mitigation that is *subject to cross-examination* by the prosecution." (*Id.* at p. 600.) Even if a defendant in a capital case had a similar right (but see *People v. Lucero* (2000) 23 Cal.4th 692, 717 [97 Cal.Rptr.2d 871, 3 P.3d 248] ["we have repeatedly held there is no right of allocution at the penalty phase of a capital trial"]), defendant in the present case was invited by the court to make a statement, but declined to do so, stating only that he wanted his witnesses to be present. Defendant did not state he was unprepared to make a statement on his own behalf.

## J. Challenges to the Death Penalty Statutes

Defendant argues that application of section 190.3, factor (a), which permits the penalty phase jury to consider the "circumstances of the crime," leads to "arbitrary and capricious decision making" in violation of the Eighth Amendment to the United States Constitution, because "[p]rosecutors throughout California have argued that the jury could weigh in aggravation almost every conceivable circumstance of the crime, even those that—from case to case—reflect starkly opposite circumstances."

 In *Tuilaepa v. California* (1994) 512 U.S. 967, 971 [129 L.Ed.2d 750, 114 S.Ct. 2630], the high court distinguished between two aspects of the capital punishment scheme: "the eligibility decision and the selection decision." In California, a defendant convicted of first degree murder is eligible for the death penalty if the jury finds true an alleged "special circumstance" enumerated in section 190.2, subdivision (a). The special circumstance must satisfy two requirements: "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of

defendants convicted of murder. [Citation.] Second, the aggravating circumstance may not be unconstitutionally vague." (*Tuilaepa v. California, supra*, 512 U.S. at p. 972.)

Once the finder of fact has determined that the defendant is eligible for the death penalty by convicting the defendant of first degree murder and finding true an alleged special circumstance, a separate penalty phase is conducted to determine whether the finder of fact will select the defendant to receive the death penalty. The high court "imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. 'What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.' [Citations.] That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. [Citations.]" (*Tuilaepa v. California, supra*, 512 U.S. at p. 972.)

There are important differences between the eligibility decision and the selection decision: "The eligibility decision fits the crime within a defined classification. Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.' [Citation.] The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." (*Tuilaepa v. California, supra*, 512 U.S. 967, 972.)

 Defendant acknowledges that the high court has approved of section 190.3, factor (a): "Petitioners' challenge to factor (a) is at some odds with settled principles, for our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. [Citation.] We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. In any event, this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (*Tuilaepa v. California, supra*, 512 U.S. at p. 976.)

But defendant maintains that section 190.3, factor (a) is improper because prosecutors have used it in various cases to argue that "starkly opposite circumstances" were aggravating, asserting, for example, that some prosecutors have argued that a defendant deserves the death penalty because the

defendant "struck many blows and inflicted multiple wounds" while others have argued that the death penalty was warranted because the defendant "killed with a single execution-style wound." We are not convinced. In making the individualized determination required at the penalty phase of whether a defendant who is eligible for the death penalty deserves the death penalty, the jury must consider the circumstances of the crime, among other factors. While all murders are morally repugnant, some are worse than others. And murders at either end of the spectrum may be particularly egregious. Thus, one prosecutor validly may argue that a defendant who killed the victim in an unusually savage attack involving multiple wounds deserves the ultimate penalty, while another prosecutor may argue with equal validity that an execution-style murder committed in cold blood stands apart and warrants the death penalty. The fact that those arguments highlight divergent circumstances does not affect the validity of factor (a).

Section 190.3, factor (b), permits the penalty phase jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant argues that the failure to require the jury to find unanimously that defendant committed a particular prior act under factor (b) denied him his right to a jury trial under the Sixth Amendment to the United States Constitution. We previously have rejected this contention, and recent United States Supreme Court decisions do not undermine this conclusion. (*People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351]; *People v. Schmeck* (2005) 37 Cal.4th 240, 304 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

We reject defendant's argument that the trial court erred in failing to delete inapplicable sentencing factors from its instructions to the jury. (*People v. Schmeck, supra,* 37 Cal.4th at p. 305.)

Contrary to defendant's argument, the trial court did not err in failing to identify for the jury which statutory sentencing factors were mitigating and which were aggravating. (*People v. Schmeck, supra,* 37 Cal.4th at p. 305.)

Defendant is incorrect in asserting that the use of the adjectives "extreme" and "substantial" "acted as a barrier to the consideration of mitigation in violation of the Sixth, Eighth, and Fourteenth Amendments." (See *People v. Schmeck, supra,* 37 Cal.4th at p. 304.)

The trial court did not err, as defendant contends, in failing to "require the jurors to make written or other specific findings about the aggravating factors they found and considered in imposing a death sentence." (See *People v.*

*Ramirez* (2006) 39 Cal.4th 398, 476 [46 Cal.Rptr.3d 677, 139 P.3d 64]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 510 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

We reject defendant's argument that he was denied equal protection of the law because defendants charged with capital crimes are afforded "significantly fewer procedural protections" than defendants charged with noncapital crimes. (*People v. Harris* (2005) 37 Cal.4th 310, 366 [33 Cal.Rptr.3d 509, 118 P.3d 545].) And the failure to require intercase proportionality review does not render unconstitutional the California death penalty statutory scheme. (*People v. Geier* (2007) 41 Cal.4th 555, 618 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Harris, supra*, 37 Cal.4th at p. 366.)

The death penalty scheme does not, as defendant argues, violate the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because juries are not instructed on any burden of proof and do not have to find beyond a reasonable doubt that aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty. (*People v. Ramirez, supra*, 39 Cal.4th at p. 475; *People v. Harris, supra*, 37 Cal.4th at p. 365; *People v. Schmeck, supra*, 37 Cal.4th at p. 304.)

We decline defendant's invitation to reconsider our holding that " ' "[b]ecause the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt," ' " there is no burden of proof or burden of persuasion. (*People v. Rundle* (2008) 43 Cal.4th 76, 199 [74 Cal.Rptr.3d 454, 180 P.3d 224].) We repeatedly have reaffirmed that holding.

Contrary to defendant's argument, the jury is not required to agree unanimously on any particular aggravating factor. (*People v. Harris, supra*, 37 Cal.4th at p. 366.) Nor must the jury be instructed that there is a presumption in favor of a sentence of life imprisonment without the possibility of parole. (*People v. Rundle, supra*, 43 Cal.4th at p. 199.)

Defendant contends that the court's concluding jury instruction, based on CALJIC No. 8.88, violated his rights to due process, a fair trial, and a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We disagree. CALJIC No. 8.88 is defective, in defendant's view, because it (1) uses the allegedly vague term "so substantial" in the instruction that each juror must be "persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole"; (2) instructs the jurors to determine whether the death penalty is "warrant[ed]" rather than "appropriate"; (3) fails to instruct the jury that it "shall" impose a sentence of

life imprisonment without parole if the mitigating circumstances outweigh the aggravating circumstances; and (4) fails to instruct the jury that neither party bore the burden of persuasion. We consistently have rejected each of these arguments. (*People v. Geier, supra*, 41 Cal.4th at p. 619.)

We also consistently have rejected defendant's contention that the California death penalty statutes violate international law. (*People v. Geier, supra*, 41 Cal.4th at p. 620.)

### K. *Cumulative Error*

Defendant contends that his "death sentence must be reversed due to the cumulative effect of the numerous errors in this case." We discern no errors, considered either individually or cumulatively, that warrant reversal of the judgment.

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., and Werdegar, J., concurred.

**CHIN, J.,** Concurring.—I agree with the majority's result and most of its reasoning. I write separately to disassociate myself from the first portion of the final sentence of part II.D., page 692, of the majority opinion: "While we do not encourage prosecutors to use such graphic and dramatic images, the prosecutor's comments in the present case were brief (see *People v. Stankewitz* (1990) 51 Cal.3d 72, 112 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Ghent* [(1987) 43 Cal.3d 739], 772 [239 Cal.Rptr. 82, 739 P.2d 1250]) and 'did not exceed the bounds of propriety.' (*People v. Medina* (1995) 11 Cal.4th 694, 778 [47 Cal.Rptr.2d 165, 906 P.2d 2].)" I agree that the prosecutor's comments did not exceed the bounds of propriety. Because the evidence supported the comments, they were entirely proper.

The cases cited for the proposition that the comments were brief and, presumably, appropriate for that reason (*People v. Stankewitz, supra*, 51 Cal.3d 72; *People v. Ghent, supra*, 43 Cal.3d 739) are irrelevant to this issue. They were decided when the United States Supreme Court had prohibited victim impact evidence and argument. (See *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].) Today, as the majority recognizes, victim impact evidence and argument are permitted. (Maj. opn., *ante*, at p. 692; see *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597].)

We have no reason either to encourage or discourage any particular argument that is otherwise proper. We should simply reject defendant's contention that the prosecutor's comments were improper and stop there.

Corrigan, J., concurred.

Appellant's petition for a rehearing was denied March 25, 2009.