Filed 9/17/14  P. v. Patterson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B248859 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA389181) |
| v. | |
| HARUM PATTERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig J. Mitchell, Judge.  Affirmed as modified.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant Harum Patterson appeals from his judgment of conviction for carjacking (Pen. Code,[1] § 215, subd. (a)), second degree robbery (§ 211), and criminal threats (§ 422). Patterson asserts the trial court violated his constitutional rights when it denied his request for self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). Patterson also argues the trial court violated section 654 and failed to properly exercise its discretion when it imposed consecutive sentences on the carjacking and robbery counts. We conclude the judgment must be modified to stay the sentence on the robbery count and to award Patterson the correct number of custody credits, but otherwise affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The Charges

In an amended information, the Los Angeles County District Attorney charged Patterson with one count of carjacking (§ 215, subd. (a)), one count of second degree robbery (§ 211), and one count of criminal threats (§ 422). It was alleged that Patterson committed the charged offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).[2] It was also alleged that Patterson had suffered four prior serious or violent felony convictions within the meaning of section 667, subds. (b)-(i) and section 1170.12, subds. (a)-(d)), five prior serious felony convictions within the meaning of section 667, subdivision (a)(1), and five prior prison terms within the meaning of section 667.5, subdivision (b). Patterson pleaded not guilty to all charges and denied the enhancement allegations.

---

[1]    All further statutory references are to the Penal Code.

[2]    Prior to trial, the trial court granted defense counsel's motion to set aside the gang enhancement allegations pursuant to section 995.

## II. The Prosecution's Case

On August 2, 2011, at approximately 1:00 a.m., Juan Carlos Cardona parked his Ford Windstar van in the area of Coco Avenue and Pinafore Street in Los Angeles. Cardona's friend, Alma Romero, lived in a nearby apartment complex, and they planned to meet that night for a late meal.

Cardona was waiting inside his parked vehicle when Patterson approached the open front passenger window. Patterson first asked if Cardona wanted drugs or women, and Cardona did not respond. Patterson then asked for money, and Cardona denied having any. At that point, Patterson became angry and walked around the van to the open driver's side window. Patterson gestured toward his waistband and twice told Cardona not to be stupid or he would shoot him. Cardona got out of the van and stood by the driver's side door as Patterson searched him. Patterson took Cardona's wallet from his back right pocket and continued searching him. Patterson then moved Cardona away from the van and demanded the keys, which were still in the ignition. Patterson got in the driver's seat and ordered Cardona to get in the passenger seat and go with him. Cardona pretended to comply, but instead ran toward Romero's apartment building. Romero was exiting the building when she saw Cardona standing near the rear of the van and a Black man in the driver's seat. Patterson sped away in the van. Cardona and Romero called 911.

The following day, Cardona's van was found abandoned in an alley on Santa Rosalia Drive, less than a mile from Romero's apartment. Patterson's right palm print was recovered from inside the vehicle on the driver's side door jamb. The police later located Patterson through a GPS tracking device that he was wearing while on parole for a prior offense. The GPS tracking system showed that Patterson was on foot in the vicinity of Coco Avenue and Pinafore Street at the time of the robbery and carjacking. It also showed that Patterson transitioned into a vehicle and then stopped in an alley on Santa Rosalia Drive a short time later.

On September 21, 2011, Patterson was arrested and interviewed by the police. He denied being in the location of the robbery and carjacking until he was told that his

3

fingerprints and GPS tracking device placed him at the scene. Patterson then admitted that he approached a Hispanic man in a van and asked for money and a cigarette. He denied ever opening the driver's side door or taking the vehicle.

## III.    The Defense Case

Patterson testified on his own behalf. On the night of August 2, 2011, Patterson and his girlfriend, Andrea Hughes, were walking around the neighborhood and smoking marijuana. Cardona called Patterson over to his van and asked where he could get some cocaine. After talking for five to 10 minutes, Cardona asked if Patterson could buy $20 worth of cocaine for him. Patterson told Cardona that they would have to go down the street near Dorsey High School, and Cardona agreed. At one point, Cardona opened the driver's side door and his bank card fell onto the street. Patterson touched the driver's side door jamb as he reached to pick up the card for Cardona. Patterson and Hughes then got into the passenger side of the van and Cardona drove them down the street. Patterson purchased the cocaine for Cardona and handed it to him. Cardona told Patterson that he needed to smoke it at that location because he did not want his girlfriend to know he was using drugs. Hughes did not want to be around someone smoking cocaine so she and Patterson decided to walk back home. Patterson left Cardona in his van and did not see him again. Patterson admitted he had four prior convictions for robbery and attempted robbery, but testified that he had been doing well on parole and avoiding legal trouble.

Hughes testified that she and Patterson were walking around the neighborhood on August 2, 2011 when Patterson stopped to talk to a Hispanic man in a van. Patterson asked Hughes to take a ride with him so that he could get the man some drugs. Hughes and Patterson got into the van and the man drove them to an area near Dorsey High School. Patterson and Hughes got out of the van and Patterson purchased crack cocaine for the man. They then walked back to her house while the man stayed in the van using the drugs. On November 10, 2011, a defense investigator interviewed Hughes. Hughes told the investigator that she remained in the van while Patterson made the drug purchase

4

and that the man then drove them back to Coco Avenue and Pinafore Street. Hughes also told the investigator that Patterson never approached the driver's side door of the van.

Cardona was also called as a witness by the defense. He testified that, during the robbery, Patterson took $20 and a bank card from his wallet and then threw the wallet into the van. Cardona never recovered either his money or his bank card.

## IV. Verdict and Sentencing

The jury found Patterson guilty on all counts. In a bifurcated proceeding, the trial court found each prior conviction allegation to be true. The court sentenced Patterson to two consecutive terms of 25 years to life on the robbery and carjacking counts, plus an additional term of 25 years based on the five prior serious felony convictions. The court imposed and stayed a term of 25 years to life on the criminal threats count pursuant to section 654. Patterson was awarded 598 days of presentence custody credit.

## DISCUSSION

## I. Denial Of the Request For Self-Representation

On appeal, Patterson contends the trial court committed reversible error when it denied his request for self-representation on the day set for trial. We conclude the trial court did not abuse its discretion in denying Patterson's untimely request, and even assuming there was any error in the trial court's ruling, such error was harmless.

### A. Relevant Proceedings

On March 28, 2012, Patterson was arraigned on the amended information before Los Angeles Superior Court Judge Lisa Lench. At that hearing, Patterson brought a *Marsden*[3] motion to replace his court-appointed attorney, Mitra Donde, because he was dissatisfied with her representation. After Judge Lench denied the *Marsden* motion, Patterson moved to represent himself under *Faretta*. In open court, Judge Lench stated, "Mr. Patterson, what I'm going to do is I'm going to give you a form to look at and fill

---

**3** *People v. Marsden* (1970) 2 Cal.3d 118.

out. And after you're finished with that form, I'm going to talk to you again." Patterson completed and signed a written *Faretta* waiver form. Judge Lench continued the hearing on the *Faretta* motion to the following day, March 29, 2012, and then to April 17, 2012. Between April 17 and July 8, 2012, Patterson appeared in court with his appointed counsel five additional times. There is no indication, however, that Patterson renewed his *Faretta* motion during any of those hearings, or that the trial court made any further ruling on that motion.[4]

On July 9, 2012, Patterson's trial was scheduled to commence before Los Angeles Superior Court Judge Craig J. Mitchell. Prior to the start of jury voir dire, Patterson brought another *Marsden* motion. He stated that he did not feel comfortable going to trial with Ms. Donde and refused to be represented by her. He also stated: "If I have to go pro per, then I'll go pro per. My family is in the process of trying to obtain counsel for me. . . ." When Judge Mitchell advised Patterson that his *Faretta* motion was untimely, Patterson replied: "I tried to do it, sir, . . . and I got ran around with Judge Lench. And her and the D.A., they was telling me to come back this day, come back this day, but they would never mention it to me. I tried to do it then. I signed the paperwork . . . to try to do it, and they gave me the rough shot and acted like I didn't try to do it, kept on going to proceed, kept asking about it. I got no response, sir. I tried to do it." In response, Judge Mitchell reiterated that Patterson's request to represent himself on the day of trial was untimely, and was "off the table" at this stage in the proceedings.

Judge Mitchell then addressed the *Marsden* motion. Patterson raised a number of issues about his current representation, including the fact that Ms. Donde had not filed certain motions on his behalf and had not contacted his main witness, Hughes, about

---

**4** The reporter's transcript does not include a record of any hearings between March 29 and July 8, 2012. The clerk's transcript, however, does include minute orders from hearings held on March 29, April 17, May 1, June 19, June 26, and July 3, 2012. Each minute order indicates that Patterson was present in court with Ms. Donde. The only reference to Patterson's *Faretta* motion is in the March 29, 2012 minute order and merely notes that the motion was continued to April 17, 2012.

6

testifying. Patterson also stated that Ms. Donde had told him the week before that she was going to present a GPS expert witness, but later informed him that she had decided not to do so. In addition, Patterson accused Ms. Donde of having "an evil disposition," being an "advocate of the district attorney," and using "racial slurs" against him when he refused to accept a plea. In response, Ms. Donde noted that she had filed a successful section 995 motion to dismiss the gang enhancement allegations, and that she had been in contact with Hughes, who was expected to testify. She acknowledged discussing a GPS expert with Patterson, but explained that she had decided not to call the expert because she believed it was unnecessary based on their theory of the case. Ms. Donde denied ever using racial slurs in speaking with Patterson.

Judge Mitchell denied the *Marsden* motion. Patterson then renewed his request to represent himself, stating: "I would like to exercise my *Faretta* rights. That's my right. I don't have to waive time. I'll go to trial on my own." Patterson also noted that it was day 8 of 10 and he still had two days of statutory time before trial to prepare. Judge Mitchell repeated his prior finding that the *Faretta* request was untimely. Patterson asked the court to reconsider its *Marsden* ruling and appoint new counsel, or to grant a one-week continuance so that he could represent himself. When Judge Mitchell denied that request, Patterson stated that he would not be present in court as long as Ms. Donde was representing him.

After concluding the *Marsden* hearing, Judge Mitchell resumed the proceedings in open court, but Patterson refused to attend. In Patterson's absence, Judge Mitchell advised counsel that, over the lunch hour, he had sought guidance from case authority regarding the *Faretta* request, and in particular, had considered the decision in *People v. Scott* (2001) 91 Cal.App.4th 1197 (*Scott*). Applying the factors set forth in *Scott*,[5] Judge

---

[5] According to *Scott*, in ruling on an untimely *Faretta* motion, "a trial court is required to consider (1) the quality of counsel's representation, (2) the defendant's prior proclivity to substitute counsel, (3) the reasons for the request, (4) the length and stage of the proceedings, and (5) the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Scott*, *supra*, 91 Cal.App.4th at p. 1204.)

Mitchell found that the quality of Ms. Donde's representation supported the denial of Patterson's *Faretta* request. He also found that Patterson previously made a *Marsden* motion, which was denied. With respect to Patterson's prior *Faretta* request, Ms. Donde explained: "He did request to go pro per, and Judge Lench told him that she would give him an answer on the next occasion, and then the next time he came back, he didn't want to pursue the pro per status." Judge Mitchell noted that he had spoken with the master calendar judge who likewise had confirmed that there was no pending *Faretta* request when the case was assigned for trial. Judge Mitchell further found that Patterson's latest *Faretta* request appeared to be based on his unhappiness with Ms. Donde's representation and the denial of his *Marsden* motion. Judge Mitchell also noted that the potential jurors had been waiting in the hallway while the court addressed Patterson's motions, and asked the prosecutor whether it would be difficult to reschedule the witnesses. In response, the prosecutor stated that she did not believe there would be any difficulty in rescheduling them, but noted that the two main witnesses were both civilians and that "it is always difficult to have civilian witnesses come to court." Judge Mitchell observed that it was difficult to fully assess the disruption or delay that might result from granting Patterson's *Faretta* motion given his ongoing refusal to come to court.

Judge Mitchell then ruled as follows: "Weighing the five criteria that is presented in the *Scott* case, the court does find that, taken in consideration together, Mr. [Patterson's] request is untimely, particularly given the fact that I find the quality of his representation to be more than satisfactory; that on many previous court appearances, he did not ask . . . for substitution of counsel or self-representation; that he, in fact, is making this request at this late moment because he is irritated and disagrees with the court's request to find a lawful justification to substitute counsel and that, in fact, we are in a situation where jurors are actually in the hallway and ready to come into this trial. Based on that assessment of the *Scott* criteria, [the] court believes it has made an adequate record of why it is exercising its discretion to deny Mr. [Patterson] his request on the day of trial to represent himself."

8

Judge Mitchell also found that Patterson had waived his right to be present at trial by refusing to come to court. After instructing the prospective jurors not to consider Patterson's absence from trial in reaching its verdict, jury voir dire commenced. The following day, Patterson renewed his request to represent himself, which the trial court denied based on its prior findings. After Judge Mitchell reiterated to Patterson the importance of attending trial, Patterson agreed to be present.

## B. Applicable Law

A criminal defendant has a right to represent himself or herself at trial under the Sixth Amendment to the United States Constitution. (*Faretta*, *supra*, 422 U.S. at pp. 835-836; *People v. Williams* (2013) 58 Cal.4th 197, 252.) "'A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.]'" (*People v. Stanley* (2006) 39 Cal.4th 913, 931-932.) An erroneous denial of a timely *Faretta* request is reversible per se. (*People v. Williams*, *supra*, at p. 253; *People v. Butler* (2009) 47 Cal.4th 814, 824.)

A defendant's right to self-representation, however, is absolute only if he or she invokes the right within a reasonable time prior to the start of trial. (*People v. Williams* (2013) 56 Cal.4th 165, 193 [the constitutional right to self-representation "must be asserted within a reasonable time before trial"]; *People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*) ["to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial"].) "The timeliness requirement 'serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 454.) "[T]imeliness for purposes of *Faretta* is

9

based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*People v. Lynch* (2011) 50 Cal.4th 693, 724 (*Lynch*), overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) "Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground. [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 433, fn. 15.)

"'When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion. [Citations.]' [Citation.]" (*People v. Williams*, *supra*, 56 Cal.4th at pp. 193-194.) "'Among [the] factors to be considered by the court in assessing [*Faretta*] requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.'" (*Id*. at p. 194, quoting *Windham*, *supra*, 19 Cal.3d at p. 128.) In evaluating a trial court's denial of a *Faretta* motion, "'a reviewing court must give 'considerable weight' to the court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made.'" (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353.) We accordingly review the denial of an untimely *Faretta* motion for an abuse of discretion. (*People v. Jackson* (2009) 45 Cal.4th 662, 689-690.)

### C.     The Trial Court Properly Denied Patterson's *Faretta* Motion

On appeal, Patterson challenges the trial court's denial of his July 9, 2012 request for self-representation. He specifically contends that the trial court erred in finding that a *Faretta* motion made on the day of trial was per se untimely. He also claims, that even if his July 9, 2012 *Faretta* motion was untimely, the trial court abused its discretion by denying the motion solely on timeliness grounds without inquiring into the circumstances underlying his renewed request to represent himself.

10

We conclude that the trial court properly found that Patterson's July 9, 2012 *Faretta* motion was untimely because he waited until the date trial was set to begin to renew his request for self-representation. As the California Supreme Court stated in *Windham*, "a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself . . . without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court . . . ." (*Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.) Patterson points out that, more recently, the Supreme Court in *Lynch* refused "to identify a single point in time at which a self-representation motion filed before trial is untimely," and recognized that "pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*Lynch*, *supra*, 50 Cal.4th at p. 723.) However, the Court in *Lynch* also observed that "we have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely," and directed its analysis to motions made outside the "two extreme time periods" between the "eve of trial" and "long before trial." (*Id*. at pp. 722-723; see also *People v. Valdez* (2004) 32 Cal.4th 73, 102-103 [*Faretta* motion made moments before jury selection was set to begin was untimely and properly denied by trial court]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [*Faretta* motion made on date scheduled for trial was untimely and its denial constituted a proper exercise of discretion]; *People v. Clark* (1992) 3 Cal.4th 41, 99-100 [*Faretta* motion made when trial was being continued on day-to-day basis, in effect on the eve of trial, was subject to trial court's discretion as untimely]; *People v. Frierson* (1991) 53 Cal.3d 730, 742 [*Faretta* motion made on eve of trial was untimely and its denial was within trial court's discretion].) Because Patterson did not renew his *Faretta* motion until the day set for trial, the decision whether to grant or deny the motion rested within the sound discretion of the trial court.

Patterson argues that, in assessing the timeliness of his July 9, 2012 *Faretta* motion, the trial court should have considered that Patterson made a prior *Faretta* motion months before trial, which was never ruled upon by the court. Undoubtedly, Patterson's March 28, 2012 request for self-representation was timely made. However, the record

11

supports a finding that Patterson abandoned that request when he appeared in court with his appointed counsel on five different occasions between April 17 and July 3, 2012 without making any attempt to renew the motion. (*People v. Butler*, *supra*, 47 Cal.4th at p. 825 ["*Faretta* right may be waived by . . . abandonment and acquiescence in representation by counsel"]; *People v. Stanley*, *supra*, 39 Cal.4th at p. 929 [defendant abandoned his asserted right of self-representation by his "subsequent acceptance of several appointed counsel to represent him"]; *People v. Tena* (2007) 156 Cal.App.4th 598, 609-610 ["after a defendant invokes the right to self-representation, a waiver may be found if it reasonably appears that the defendant abandoned the request"].) Additionally, at the July 9, 2012 hearing, Patterson's appointed counsel, Ms. Donde, represented to the trial court that, while the prior *Faretta* motion was pending before Judge Lench, Patterson decided that he "didn't want to pursue the pro per status." The trial court also noted that it had consulted on the matter with the master calendar judge, who confirmed that there was no record of any pending *Faretta* motions by Patterson when the case was assigned for trial. Under these circumstances, the trial court reasonably could find that Patterson had abandoned his prior request for self-representation.

Patterson also asserts that his July 9, 2012 *Faretta* motion was timely because he made the motion at the first available opportunity after a conflict arose with his appointed counsel about trial strategy, and he did not request a continuance of the trial date. The record, however, reflects that Patterson's dissatisfaction with Ms. Donde's representation dated back to the March 28, 2012 arraignment when he made his first set of *Marsden* and *Faretta* motions, which were denied. Furthermore, in denying Patterson's second *Faretta* motion, the trial court reasonably found that Patterson's last-minute request for self-representation was the result of his unhappiness with the denial of his second *Marsden* motion. With respect to a continuance, Patterson's statements to the trial court on this subject were ambiguous. On the one hand, at the July 9, 2012 hearing, Patterson told the trial court: "I would like to exercise my *Faretta* rights. That's my right. I don't have to waive time. I'll go to trial on my own." On the other hand, at that same hearing, Patterson asked for additional time, stating: "I will humbly ask the court to reconsider

12

getting me other counsel, giving me a week continuance, so I can be my own attorney, sign my *Faretta* rights." During the hearing, Patterson also repeatedly complained to the trial court that his main witness, Hughes, was not then available to testify, and as a result, he should not be forced to go forward with a trial on that date. In any event, in deciding whether a request for self-representation is untimely, "[t]he circumstance that defendant did not seek a continuance is not determinative." (*People v. Jenkins* (2000) 22 Cal.4th 900, 963 [trial court did not abuse its discretion in denying *Faretta* motion made after start of trial even though defendant did not seek a continuance]; see also *People v. Howze* (2001) 85 Cal.App.4th 1380, 1397 [trial court had discretion to deny *Faretta* motion unaccompanied by request to continue when made two days prior to trial].) The record demonstrates that, at the time Patterson made his *Faretta* motion, both the prosecutor and defense counsel were prepared to proceed to trial that day, the subpoenaed witnesses were ready to testify, and the prospective jurors were waiting in the hallway. Under these circumstances, there is no basis in the record to find an abuse of discretion in the trial court's ruling.

Alternatively, Patterson contends that, even if his July 9, 2012 *Faretta* motion was untimely, the trial court abused its discretion by denying the motion without examining the specific factors underlying his request. In support of this claim, Patterson notes that, when the trial court initially denied the motion, the court repeatedly stated that it was doing so because the motion was untimely. Patterson reasons that, following a break in the proceedings, the trial court must have realized that it had failed to properly exercise its discretion in its denial of the motion because it then made an after-the-fact attempt to justify its ruling by evaluating the *Windham* factors on the record. This claim lacks merit. The Supreme Court in *Windham* "decline[d] to mandate a rule that a trial court must, in all cases, state the reasons underlying a decision to deny a motion for self-representation which is based on nonconstitutional grounds." (*Windham*, *supra*, at p. 129, fn. 6.) Instead, the trial court's exercise of discretion in denying an untimely *Faretta* motion is properly affirmed if substantial evidence in the record supports the inference that the court had those factors in mind when it ruled. (*Scott*, *supra*, 91

13

Cal.App.4th at p. 1206 ["while the trial court may not have explicitly considered each of the *Windham* factors, there were sufficient reasons on the record to constitute an implicit consideration of these factors"]; *People v. Perez* (1992) 4 Cal.App.4th 893, 904 ["[w]hile the court did not specifically make [a *Windham*] inquiry, . . . there were sufficient reasons on the record for the court to exercise its discretion to deny the request"].) This is true even if the court not only failed to state the reasons for its denial of the motion, but also failed to make the sua sponte inquiry required under *Windham*. (*People v. Dent* (2003) 30 Cal.4th 213, 218 [where a trial court denies a *Faretta* motion without making a proper *Windham* inquiry, "if the record as a whole establishes defendant's request was nonetheless properly denied on other grounds, we would uphold the trial court's ruling"].)

Here, although the trial court did not explicitly consider the *Windham* factors when it initially ruled that Patterson's *Faretta* motion was untimely, the court did evaluate each of the *Windham* factors later in the hearing and made an adequate record of its reasons for denying the motion. In particular, the trial court found that Patterson's appointed counsel was representing him in a conscientious and diligent manner, that Patterson had made two *Marsden* motions to substitute counsel which were denied by the court, and that Patterson's last-minute *Faretta* motion was made out of frustration with the denial of his second *Marsden* motion. The trial court also found that, while the prosecution witnesses could be rescheduled, the prospective jurors had been waiting in the hallway since the morning for jury selection to begin. Patterson asserts that, because he was not present in the courtroom at the time of the *Windham* inquiry, the trial court could not properly assess whether granting the *Faretta* motion would cause disruption or delay. However, Patterson's absence from the proceedings was due to his own refusal to appear in court, and he cannot now complain that the trial court was unable to make an adequate inquiry into the reasons underlying his request. Based on the totality of the record, the trial court acted well within its discretion in denying the *Faretta* motion.

14

**D.    Any Error in the Trial Court's Ruling Was Harmless**

Even assuming there were any error in the trial court's ruling, Patterson is not entitled to relief unless he can show that such error was not harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058 ["erroneous denial of an untimely *Faretta* motion is reviewed under the [*Watson*] harmless error test"]; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050 [although trial court erred in failing to exercise its discretion in ruling on an untimely *Faretta* motion, "this error is not automatically reversible, but is reviewed under the 'harmless error' test of *Watson*"].)  In considering whether it is reasonably probable that a result more favorable to Patterson would have been achieved in the absence of the claimed error, we cannot ignore that a defendant who represents himself or herself rarely, if ever, could achieve a better result than competent counsel could obtain.  (*Faretta*, *supra*, 422 U.S. at p. 834 ["It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."]; *People v. Rivers*, *supra*, at p. 1051 ["It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel."].)

Patterson does not dispute that he was represented by competent counsel at trial, and through his attorney's representation, the trial court dismissed the gang enhancement allegations.  The evidence against Patterson was also compelling.  At trial, Cardona identified Patterson as the perpetrator of the robbery and carjacking and Cardona's girlfriend confirmed that she saw a man matching Patterson's description drive away in Cardona's van.  In addition, the GPS evidence placed Patterson in the vicinity of the robbery at the time it occurred and inside the van as it drove to the location where it was later recovered by the police.  Patterson's claim that he could have retained a GPS expert to challenge the accuracy of the prosecution's GPS evidence is entirely speculative.  Under these circumstances, we see no reason to believe that Patterson could have mounted a stronger defense at trial by becoming his own attorney.  Any error in denying Patterson's untimely request for self-representation was therefore harmless.

15

## II.  Imposition of Consecutive Sentences for Carjacking and Robbery

On appeal, Patterson also challenges the trial court's imposition of consecutive sentences of 25 years to life on the carjacking and robbery counts.  Patterson argues that the trial court should have stayed the sentence on the robbery count under section 654 because the robbery and carjacking arose from a single course of conduct and were committed pursuant to a single objective.  Alternatively, Patterson asserts that, even if separate punishments were permitted under section 654, the trial court failed to properly exercise its discretion in imposing consecutive terms for those offenses.  We conclude that section 654 barred the imposition of separate sentences for the carjacking and robbery, and the trial court thus erred in failing to stay the sentence on the robbery count.

### A.  Relevant Proceedings

At the sentencing hearing, the trial court imposed a term of 25 years to life on the carjacking count.  The trial court then stated:  "As to [the robbery count], insofar as the robbery factually was separate and distinct from the carjacking, the court believes that a consecutive sentence is appropriate.  That sentence will be life plus an additional 25 year minimum sentence."  Patterson, who represented himself at sentencing, objected to the imposition of consecutive terms, arguing that the crimes were "all one act" and occurred "at one time."  The trial court responded:  "It was not one act.  You took property from Mr. Cardona that was separate and distinct from the decision you [made] later on in the course of conduct to take his vehicle."  The trial court stayed the sentence on the criminal threats count pursuant to section 654.

### B.  Applicable Law

Section 654 provides, in pertinent part, that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  "'Section 654 bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective.  [Citation.]'

16

[Citation.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368.) "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507, italics omitted.)

"'[T]he purpose of section 654 "is to insure that a defendant's punishment will be commensurate with his culpability."' [Citation.] 'It is [the] defendant's intent and objective, not temporal proximity of his offenses, which determine whether the transaction is indivisible.' [Citation.] '"The defendant's intent and objective are factual questions for the trial court; . . . there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced."' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 886.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence. [Citation.]" (*People v. Brents* (2012) 53 Cal.4th 599, 618.) Substantial evidence is "'evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

"Robbery occurs when any type of personal property is removed from the victim by force or fear with the intent to permanently deprive the victim of possession of the property. [Citation.] Carjacking requires the taking of a motor vehicle by force or fear with the intent to temporarily or permanently deprive the victim of possession of the vehicle." (*People v. Green* (1996) 50 Cal.App.4th 1076, 1083-1084, fn. omitted.) The two crimes share certain elements. "'Both involve "the felonious taking" of property that is "in the possession of another" person. Both require that the taking be from the "person or immediate presence" of the person. Both are "accomplished by means of force or fear."' [Citations.]" (*People v. Lopez* (2003) 31 Cal.4th 1051, 1059.) However, neither robbery nor carjacking is a necessarily included offense within the other, and a person

17

may be charged and convicted of both crimes based on the same conduct. (§ 215, subd. (c); *People v. Ortega* (1998) 19 Cal.4th 686, 700; *People v. Green*, *supra*, at p. 1084.)

In general, where a carjacking and robbery are committed simultaneously for the singular purpose of depriving the victim of his or her property, the two crimes are not separately punishable. (See, e.g., *People v. Dominguez* (1995) 38 Cal.App.4th 410, 420 [carjacking and robbery constituted the same act for purposes of section 654 where the defendant "placed [a] cold metallic object to the back of the victim's neck and demanded 'everything he had,'" and "[s]imultaneously, the victim handed over his jewelry and van"].) On the other hand, where a carjacking and robbery involve more than one objective, or derive from two distinct acts occurring consecutively rather than concurrently, the offenses may be subject to separate sentences. (See, e.g., *People v. Green*, *supra*, 50 Cal.App.4th at p. 1085 [where the defendant approached the victim in her vehicle, took her purse, drove her to a secluded area for an attempted rape, and then took off in her car, "the taking of the purse and the taking of the vehicle were separate incidents which merited separate and additional punishment" under section 654].)

In *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*), the defendant entered the elderly victims' residence and robbed them of various items of personal property. The defendant carried the items into the garage, and two hours later, drove away in one of the victims' cars. (*Id*. at p. 372.) The Supreme Court held that section 654 precluded separate punishment for the robbery and the automobile theft. (*Id*. at pp. 376-378.) In so holding, the Court rejected the Attorney General's argument that consecutive sentences were warranted because the defendant formed the intent to steal the car only after the other items had been taken. Instead, the Court reasoned: "The fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an indivisible transaction. [Citations.] And the fact that one of the crimes may have been an afterthought does not permit multiple punishment where there is an indivisible transaction." (*Id*. at p. 377; cf. *People v. Capistrano*, *supra*, 59 Cal.App.4th p. 887 [separate punishment for robbery and carjacking were permitted under section 654 where the defendant and his cohorts

18

"confronted the victims at two points" by "first accost[ing] them at their cars and then again, inside the victims' residences when they demanded the victims' money and property"].)

### C. The Trial Court Erred in Failing to Stay the Sentence on the Robbery Count Under Section 654

In this case, there was no substantial evidence to support the trial court's finding that the carjacking and robbery counts were subject to consecutive sentences. The evidence at trial established that, after Patterson approached the driver's side window of Cardona's van, he forced Cardona out of the vehicle with the threat of violence and began searching him "to see if he had anything." Patterson took Cardona's wallet from his back pocket, moved Cardona away from the driver's side door, and demanded that Cardona give him the keys. Patterson then got into the driver's seat of the van and ordered Cardona to get into the passenger seat and go with him. Cardona pretended to comply, but ran to his girlfriend's apartment complex as Patterson sped away in the van. During the commission of the crimes, Patterson gestured toward his waistband and told Cardona not to be stupid or he would shoot him.

In imposing consecutive sentences on the robbery and carjacking counts, the trial court found that the two offenses did not constitute a single transaction because Patterson formed a separate intent to take Cardona's van after he took Cardona's wallet. However, the mere fact that separate items of property were taken from Cardona does not, in and of itself, support an inference that Patterson acted with a separate intent. Instead, based on the evidence presented at trial, Patterson took Cardona's wallet and vehicle in one indivisible transaction, the objective of which was to deprive Cardona of his property by means of force or fear. That same force and fear was used to commit both crimes, and the robbery was not separated in either time or place from the carjacking. Rather, both offenses were committed at the same location as part of a continuing course of conduct, and the GPS evidence showed that the entire transaction only lasted a few minutes. Indeed, the robbery was still in progress when Patterson got into the van and ordered Cardona to go with him since Patterson had not yet reached a place of relative safety.

19

(*People v. Anderson* (2011) 51 Cal.4th 989, 994 ["'crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety'"]; *People v. Irvin* (1991) 230 Cal.App.3d 180, 185 ["crime of robbery . . . is not completed until the robber has won his way to a place of temporary safety"].)

On this record, there was no evidence from which it reasonably could be found that Patterson harbored one objective when he took Cardona's wallet and a different objective when he took Cardona's van during the same course of conduct. Instead, the only reasonable inference that could be drawn from the evidence was that Patterson committed each crime with the single objective to deprive Cardona of his property. As the Supreme Court stated in *Bauer*, "where a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." (*Bauer*, *supra*, 1 Cal.3d at p. 377.) Because the evidence was insufficient to support the trial court's finding that Patterson acted with separate and distinct objectives in committing the robbery and carjacking, section 654 precluded the imposition of consecutive sentences for these two offenses. The judgment accordingly must be modified to stay the sentence on the robbery count.[6]

### III. Custody Credit

Patterson contends, and the Attorney General concedes, that the trial court erred in its calculation of Patterson's custody credit award. The trial court awarded Patterson 598 days of presentence custody credit, consisting of 509 days of actual custody credit and 89 days of conduct credit. However, Patterson was arrested on September 21, 2011 and was sentenced on May 10, 2013. Patterson is therefore entitled to 598 days of actual custody credit plus 89 days of conduct credit for a total presentence custody credit of 687 days. Patterson's abstract of judgment must be modified accordingly.

---

[6] In light of our conclusion that section 654 barred separate punishment for the robbery and carjacking, we need not address Patterson's alternative argument that the trial court failed to properly exercise its discretion in imposing consecutive sentences.

## DISPOSITION

The judgment is modified to stay the term imposed for the second degree robbery conviction (count 2) pursuant to section 654.  The judgment is further modified to award Patterson a total of 687 days of presentence custody credit, consisting of 598 days of actual custody credit and 89 days of conduct credit.  As modified, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


ZELON, J.


We concur:


WOODS, Acting P. J.


SEGAL, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.